## Case No. 11,618.

The REBECCA.

[Blatchf. & H. 347.] [1]

District Court, S. D. New York. Jan. 10, 1833.

COLLISION — CLOSEHAULED — WATCH ON DECK — ABANDONMENT—DESPERATE CONDITION —MEASURE OF DAMAGES.

1. It is the duty of a vessel sailing with the wind free and meeting a vessel closehauled, to avoid the latter, and the former is liable for the damages occasioned by a collision, unless it is proved that she took all proper measures to prevent it.

[Cited in The Maria & Elizabeth, 7 Fed. 254.]

2. A usage, with coasting vessels, to run, under certain circumstances, without a watch on deck, is nugatory, and will be wholly disregarded.

[Cited in The Blossom. Case No. 1,564.]

3. Where a vessel injured by a collision is abandoned by her crew and afterwards lost, it is enough, in an action for her value, to prove that her condition at the time appeared to be desperate, even if it be proved that she might have been saved had her crew remained with her.

[Cited in The Hope, 4 Fed. 96.]

4. The measure of damages in such a case is the full value of the vessel and of her freight.

[Cited in The Baltimore, 8 Wall. (75 U. S.) 386.]

This was a libel in rem, for collision. The schooner Richard and Douglass, of which the libellants were owners, was on a voyage from York River, in Virginia, to New-York. The schooner Rebecca was proceeding from New-York to Philadelphia. The two vessels came into collision early in the morning, on the 1st of September, 1832, off the great swamp near Barnegat Inlet, New-Jersey, several miles from the shore. The wind was blowing fresh from the northeast at the time, and the Rebecca was running free before it.

[1] [Reported by Samuel Blatchford, Esq., and Francis Howland, Esq.]

at the rate of about eight knots an hour. The Richard and Douglass was closehauled, and was running about northwest, at the rate of three knots an hour. No one was on deck on board the Rebecca, except the man at the helm. He was not aware of the proximity of the other vessel, nor did he see her until the instant of the collision. Evidence was offered of a custom for coasters to run by daylight, up and down the coast, without a watch on deck. The crew of the Richard and Douglass were all on deck, and, apprehending danger of a collision, took some precautions, with a view to avoid it. The Richard and Douglass was deeply laden with wheat, and the Rebecca was light. A hole was broken through the side of the Richard and Douglass, by the collision, and she was immediately abandoned by her crew, who had only time to get on board the Rebecca, the vessels separating at once. The Richard and Douglass, after being abandoned, drifted on shore, and was wrecked and totally lost, and the Rebecca proceeded directly on her course. The wind and sea were high at the time. The nearest port was Egg Harbor Inlet, distant ten or twelve miles to leeward. The other facts sufficiently appear in the opinion of the court.

Edwin Burr and Erastus C. Benedict, for libellants.

(1) Since it is admitted that the Richard and Douglass was closehauled, and that the Rebecca had the wind free, the libellants are entitled to recover, because the law imposes on the vessel having the wind free, the obligation of avoiding the collision. (2) The responsibility of the accident should lie on the Rebecca, for gross negligence in not keeping a watch. Jac. Sea Laws, 389. The custom sought to be set up is not proved, and is nugatory even if proved. (3) The Rebecca is liable in damages to the full value of the Richard and Douglass, if the peril was at the time so great as to justify the crew of the latter in abandoning her, whatever the real danger may be proved to have been. It was hazardous to the lives of all to remain on board, and there was no apparent possibility of saving the vessel at the time.

George Wood and Daniel Lord, Jr., for claimant.

(1) The rule that a vessel having a free wind shall give way to one on a wind is not inflexible, like a rule of property, and does not exempt the vessel which is closehauled from the necessity of making suitable exertions to avoid a collision. The rule referred to properly applies only where both parties see each other, or neither party sees the other, and where the accident arises solely from the non-observance of the rule. But, in this case, the parties were not on an equality, since the libellants were apprized of the danger long before the claimant was, and the accident arose in part from the negligence of the libellants in not taking proper measures to prevent the collision. (2) Not having a watch on board, does not show negligence in the Rebecca, since the usage to run without a watch, under like circumstances, is established. The evidence to the contrary only proves that a watch is necessary where many vessels crowd the track. (3) As to the measure of damages, the collision was not the proximate cause of the loss, and the claimant is therefore not liable for a loss which was the consequence of a want of skill and courage in the libellants in deserting their vessel. At the most, he is liable only for the loss caused by the collision itself. The wreck of the vessel was owing, not to the collision, but to her floating about and becoming afterwards beached and exposed to the breakers.

BETTS, District Judge. On some points, there is a direct conflict between the testimony of the crews of the two vessels, and, in those particulars, they are, on both sides, supported and contradicted in some degree, by witnesses from other vessels which were in sight at the time of the collision—for instance, as to whether the Rebecca was running with both sails on the larboard side, or with one on the larboard and the other on the starboard, or wing and wing, as it is termed; and as to the hypothesis, whether the Richard and Douglass could, by proper management, have avoided the Rebecca; and, also, as to the question, whether the former so manoeuvered as to ensure the collision and increase its force. The counsel for the respective parties have discussed, with great minuteness and discrimination, the testimony, in its bearing upon those inquiries, but it does not appear to me important now to decide its relative credibility or weight. In my judgment, the undisputed facts of the case, under the rules of the maritime law, cast the responsibility for the collision upon the Rebecca.

A cardinal rule of navigation, recognised by eminent authorities, is, that a vessel running free, and approaching another going in an opposite direction, on the wind, must give way to the latter or bear the consequences of a collision, unless such collision be clearly produced by the misfeasance of the vessel that is closehauled. The Woodrop Sims, 2 Dod. 83; 3 Kent, Comm. 230; Story, Bailm. § 611. This rule was enforced in the case of The Woodrop Sims and in that of The Thames, 5 C. Rob. Adm. 348, although, in each case, there was a cautious watch on deck, and active exertions were made by the vessel which had the wind free, to avoid the collision. But, as the advantage was so decidedly with that vessel, she was held responsible for not using it with success. She was charged with negligence, because she failed to prove that she had employed every measure within her power to prevent the collision.

In the present case, independently of that

want of precaution and skill in the management of the Rebecca which the law implies, there was positive fault and gross negligence, in omitting to station a watch on her deck. The evidence offered to prove that a custom prevails with coasting vessels, to run along the coast in daylight without a watch on deck, must be wholly disregarded by the court. Could a custom of that character be clearly established, it would be of no avail. No court would uphold it. Property and persons transported along the coast would, under such a usage, be exposed to constant peril and disaster; and a custom of that character would be disregarded and pronounced nugatory, as injurious to navigation and trade, and perilous to life. It is but just to the character and conduct of the navigators upon this coast, and it is highly gratifying to the court, to say, that the evidence fails to show that any such usage has been established, or any such practice approved, along this coast.

The disaster in this case was indisputably occasioned by the ignorance, on the part of the helmsman of the Rebecca, of the position of the other vessel. A slight change of his rudder, with the rapid movement of his vessel, would have been sufficient, as the evidence shows, to have carried her clear of the Richard and Douglass. His place was not the best one, nor was it a proper one, to enable him to discover objects in his way. That was the business of a look-out, who should have been so stationed as to be able to command a view of objects approaching or approached, and to apprize the helmsman when a change of his course became necessary. The failure to provide that aid and assistance to the safe navigation of the Richard and Douglass, was an act of gross negligence. It was computed by the counsel for the claimant, that the velocity of the Rebecca was 690 feet per minute, and that of the Richard and Douglass 260 feet per minute, at the moment of collision, and it was insisted that the two vessels were running on lines perpendicular to each other. The Richard and Douglass was 57 feet in length. It is, therefore, manifest, that a slight change of the course of the Rebecca, a minute or two before the time of collision, would have carried her across the line of contact, and beyond the reach of the Richard and Douglass. There is no proof, on the part of the claimant, that the helmsman of the Rebecca had notice of the approach of the Richard and Douglass, even when the vessels were only that space of time apart, or that, if aware of her proximity, he then took any measures calculated to avoid her. The Rebecca must, therefore, be held responsible for the injury caused by the collision.

It has been made a question, whether the abandonment of the Richard and Douglass, and her subsequent loss, were the necessary consequence of the injury she received in the collision. The argument for the claimant is, that by the exertion of proper intrepidity and activity on the part of her crew, she might have been saved, and that her loss is not attributable immediately to the injury inflicted by the Rebecca, but to the desertion of her crew. There must necessarily, in an occurrence like this, be an uncertainty whether the injury received rendered the preservation of the damaged vessel hopeless, or whether the employment of reasonable fortitude, skill and exertion might not have saved her. No court will countenance the abandonment of a vessel at sea, by her crew, because of slight or even ordinary dangers. The duty of a sailor calls on him to brave and struggle with perils of the most sudden and appalling character. He cannot be excused in withdrawing his exertions to save his vessel, unless the hazard to life or limb is palpable and imminent—not that danger calculated to terrify men unused to the hazards of the sea, but such as would naturally daunt the courage of practised and resolute seamen. Nor are mariners justified in deserting a vessel under casualties which may menace her destruction, such as the carrying away of her apparel in a gale, or a leak, or trending upon a lee-shore; but. in emergencies of manifest peril, they must continue faithfully to strive for her preservation and security. There must, however, be a limit to this obligation. When the exigency arises, in which a firm and considerate man may reasonably believe the situation of his ship to be desperate, he is justified in yielding to the higher law of his nature, and in devoting what are apparently his last exertions to the rescue of his own life. It is obvious that every case must, in a great degree, be determined, in this respect, by its individual circumstances. What, in one instance, would render the condition of a vessel hopeless, might, in another, under similar dangers, not expose her to any hazard beyond the control of well-directed skill and energy.

In view of these general considerations, two points are to be decided: (1) Whether the injury received by the Richard and Douglass, in the collision, was such as to render it impossible for her crew to save her; and, (2) if, on the evidence now presented, her ultimate preservation, through the exertions of her crew, was not only possible, but was reasonably to be expected, whether, under all the facts in proof, and known to them, they were justified in abandoning her. If the injury, so far as it was known on board, was of a character to create a reasonable belief that it was a fatal one, and that the destruction of the vessel would follow suddenly, that would justify her crew in deserting her. Even if, then, her actual loss might be ascribed to their absence, and if the aid they would have been able to render her might have saved her, the responsibility of the colliding vessel would be in no way affected

thereby; because, it would be unimportant whether she foundered for want of her crew, or because of the injury she received in the collision. In either aspect, it appears to me, that the weight of evidence is decidedly against the claimant. Without recapitulating the proofs, I think the clear result of them is, that the Richard and Douglass had received that degree of injury which, in her situation, would have rendered a continuance on board, with a view to any attempt to save her, imminently hazardous to the lives of her crew. She was deeply laden with wheat in bulk, so that she could not have been lightened without great labor and delay. Wheat is specifically heavier than water, so that the sinking of the vessel would have been accelerated by her cargo; and, moreover, wheat, when wet, swells with a force that must have rapidly enhanced her danger. A hole was broken through her side, below her deck, and, in her then state of lading, below the water-mark. The wind was violent. She was on a lee shore. The breakers were running so far out that it would have been utterly desperate to attempt to beach her; and no boat could have made land through the breakers. Her boat was too small and light to be safe for her crew, in that state of the sea; and the only port she could have hoped to reach, was ten or twelve miles to leeward, and did not afford sufficient water, at ordinary tides, to allow the vessel to pass the bar. The crew of the Rebecca used all their exertions to separate the vessels the moment they struck, all hands then apprehending that both might go down together. No suggestion was made that the crew of the Richard and Douglass had better remain with her, or that they would receive any aid from the Rebecca, if they did so. They merely had time to get on board of the Rebecca, when the vessels were cleared of each other: and the Rebecca pursued her course, without deeming it worth an attempt to put about and get alongside the Richard and Douglass under the expectation that any assistance would be of service to her. Looking at the case as it was then presented to those involved in the calamity, I am satisfied that the crew of the Richard and Douglass were justified in leaving her, and, also, that the proof shows that her loss was the immediate consequence of the collision.

I might have placed these conclusions upon the principle, that it was incumbent on the vessel committing the wrong to show, by clear evidence on her part, that the loss sustained did not necessarily result from that injury, and that such proof has not been produced by the claimant. But, even admitting that the libellants were required to show, affirmatively, that the loss was caused directly by the collision, I am of opinion that it has been sufficiently established, and shall, accordingly, decree damages to the full value of the vessel and freight, with costs. Decree accordingly.